Your Honor. You may proceed. May it please the court, John Young on behalf of the City of Desloge, Missouri. This case involves an error by the district court in granting a preliminary injunction for the reason that the KKK is not likely to prevail on the First Amendment free speech claims because the evidence showed that the Desloge distribution provisions in the ordinance are narrowly tailored. The Desloge distribution provisions basically prohibit distribution within the roadways of Desloge and the roadways are defined to not include sidewalks and to cover strictly curb-to-curb pavement. The trial court, well first of all, the intermediate scrutiny test is what should apply. Heffron and Rock Against Racism, two U.S. Supreme Court cases, and then as basically followed in the Acorn v. St. Louis County 8th Circuit decision, set out that the intermediate scrutiny test is applicable. Where an entire medium of expression is not prohibited but is only regulated by time, place, and manner restrictions, then the regulation is constitutional. You just ran right by McCullen, didn't you? I'm sure it wasn't accidental. If McCullen applies and makes his content-based, then you're wrong already. Well, your honor, I don't think there's a dispute over content-based here. The court didn't find there was a content-based problem. I thought the 28J letter, I think McCullen has opened up that can of worms, if you will, almost across the board. So why doesn't it apply here? Well, I don't think it applies here, your honor, because the ordinances are basically neutral. They seem to be. I mean, and I think that the test is to look to those provisions. Let me ask this, what other organizations, institutions, individuals have ever distributed materials this way in the city's experience that led to this ordinance? The evidence shows through the testimony of Greg Camp, who was a member of the board of They didn't have an ordinance on the books regarding this. And there was solicitation by teenage sports groups where they would go out in the streets. And there were also distribution of handbills by different groups. And in response to that, the board of the Alderman of the City of the Lodge passed the 1999 ordinance. The current amended ordinance is a successor to that, continuing to try and respond to the city's significant governmental interest in pedestrian and traffic safety within its roadways. And what what organ, I don't know if you have legislative history, what organizations activities prompted this? The first, the first one sounds pretty much like our St. Louis County case. I think it is, your honor. Okay, so what what prompted the city of rulers to make it much, much more restrictive? You mean into the current amended ordinance in with the distribution provision? There's no question. It was the the KKK. I mean, now we're starting to look a little more content based. Well, except your honor, I think that the answer to that is, is that the reason that the ordinance changed over time was there was a recognition that the definition of streets included sidewalks. And it's it's clear that sidewalks are not to be part of the particular prohibition. The regulation shouldn't cover sidewalks. Sidewalks are free game for the First Amendment in a general way. And particularly the city here had its governmental interest. And I think it's important for the court to recognize that here. The governmental interest was for pedestrian and traffic safety in the roadway. It didn't involve congestion. It didn't involve littering. It didn't involve a number of other that a number of the other cases that might go the other way would suggest and so over time, and admittedly, it was not done immediately. The amended ordinance took on the form that ultimately is before this court. And it was in an effort to continue to make the prohibitions apply only within the streets. This is okay. I've driven in a lot of cities and occasionally in rush hour over the course of many years, and I don't know how many times I have seen on an organized basis during commuter rush hours, newspaper vendors standing on the median of a boulevard and stepping out of the street to sell a newspaper to cars stopped at a semaphore. That's just, I was going to, where has that ever been challenged? Because I've seen it all over the country. Well, it's been challenged, it was challenged in Acorn v. St. Louis County. And the St. Louis County ordinance. I'm talking about just stepping off to the drive to the left lane. Your Honor, I think St. Louis County's ordinance covers that. And certainly the Deloge were egregious. They sound like what you're talking about, the teenage sports group running out in multiple lanes of traffic, more or less ignoring whether the stoplight is still red, yellow, or green. I'm talking about adult newspaper vendors stepping off the curb to sell newspapers to cars in the left lane parked, stopped at a semaphore. I have seen that in many in the Sixth Circuit, in the most recent decision they handled on distribution, Harrington v. City of Brentwood, that's in fact what was going on. There was a newspaper entity who was working and going out in the streets, and they were offering their paper, and their paper included a message with a religious content, I believe. And the Sixth Circuit, which considered distribution, concluded that the Kentucky state statute that prohibited that kind of activity within the roadway was valid and constitutional. And it did that, applying the same intermediate scrutiny standard that I was talking about earlier here, where you have to have content neutrality. It has to be narrowly tailored to serve the significant governmental interest, and it leaves open ample alternative channels for communication of the information. Here, we suggest there's the only real dispute, the court dispute here is whether the distribution provisions were narrowly tailored with respect to time, place, and manner regulations. The trial court below erred in three significant ways. First of all, it applied to the U.S. Supreme Court Jamison and Schneider cases, which were 1930s and because the issues there and the ordinances there banned an entire medium of expression with citywide. Throughout the city streets, throughout the sidewalks, it was banned completely. And because the governmental interest in those two U.S. Supreme Court cases were far less significant interests. One was they wanted to control littering, so they had hand-billing of prohibited in the entire city. And the other basically said to the city of Dallas, told the Supreme Court, we have a plenary power as a municipality. So those cases, which the court below said it was compelled to follow, really aren't applicable here. The proper analysis is to apply the intermediate scrutiny test. And in fact... And in Johnson, we said in the... And in fact, that's exactly what I was gonna say. In the abstract, controlling crowds, which includes safety, can constitute a significant governmental interest that bears directly on public safety. But in the abstract doesn't allow a First Amendment, a restraint on speech. It can't just be in the abstract. And in Johnson, they completely fail that one. I think a better record than this to establish a real need, a real safety-based crowd congestion-based need. And I don't see it here. I mean, you have one expert who says any pedestrian who's in a roadway, that creates a safety hazard. Well, fine. I think we all knew that. Your Honor, I think that the difference in Johnson is that the governmental interest there is... I know the difference in Johnson, but I'm trying to get you to tell me what the real need is here, other than just saying it's safety-related. Well, I think the real need is the testimony of Mr. Camp that identified a specific issue that the Board of Aldermen identified needed protected and regulated. That is the conduct of solicitation and distribution in the roadways. That taking one step off of a median to hand a piece of paper to a stopped vehicle when the driver wants it, creates a public safety risk. Your Honor, the problem... Is that defined in that? Here's the problem with that, Your Honor. You've made an assumption, and the KKK argues, and it's assumed in that, is that they know what the driver that supposedly stopped in the street is going to do. And that driver is operating a 4,000-pound vehicle, and if they misinterpret what the driver's doing, then you have a serious personal injury issue. And I think that's what's overlooked here. I think that what Johnson... That kind of speculation is fine for bureaucratic regulation, but not for First Amendment restraints. I would suggest it's not speculation. I would suggest it's common sense. And this court... No, no, wait. Not common sense. Let's go Justice Breyer's route. Let's talk about some serious empirical evidence. In Acorn, they had it. They had a video showing the solicitors doing highly dangerous things that even Acorn's experts admitted were way off the safety charts. What is there here? I think what there is here, Your Honor, is the report provided by Mr. Braymeyer, and Mr. Braymeyer talks about the problems with pedestrian activity within the roadways. He talks about what the risks are. He's evaluated all kinds of circumstances. He's familiar with the roads, and we have the evidence that there have been activities where there was risky behavior. The cases say that we don't have to wait and prove an accident happened or an injury occurred as a result of the distribution within the roadways. This court in Acorn v. St. Louis County says that's not the case. The court in the city of Baton Rouge case say that's not the case. So what we have here is we've shown a real need. The other thing is the cases say that the preamble to the ordinance can provide evidence, and the preamble to this ordinance lays out exactly what the city board of aldermen saw as the problem, what their governmental interest was, and why they thought they needed to protect with the distribution provisions. Ultimately, Your Honor, I think there has been a real need shown here, and the fact that ... The other thing I'll point out is in Acorn v. St. Louis County, the court there said that, and I'm talking about this court, said that there's no probative value in offering evidence that there were no injuries as a result of the distribution, in that case, solicitation activity. So the problem here is ... Let's be fair. There was no probative value when there was a mountain of evidence of dangerous activities elsewhere. There's no probative value in Acorn saying, well, none of our people have actually been hurt. That's what the opinion said. That's a different context. We're always yanking dicta out of context and banging and controlling. Your Honor, I think that a real need has been established here. I think that common sense shows that there is this safety issue with people out in the roadway, and I think that that is where the trial court below erred. The failure ... What does the record show about the actual attempts that the Klan has made to ... What does the record show about the actual attempts made by the Klan to distribute the literature? The record shows that the Klan was ... When they showed up to distribute in the street, an officer observed them, and they were told of the fact that there was an ordinance in effect that prohibited that conduct. Frankly, that was a different version. We worked an arrangement with the Klan, and that's when the city engaged the expert witness and ultimately concluded the amended ordinance as the issue here. But that same evidence is the evidence that prompted this issue. Did the Klan then just go home? Yeah. To my knowledge, since that day, the Klan has never been back and never attempted to distribute on the sidewalks, in the park, in the streets, or anywhere. They got the preliminary injunction, and they have not done anything after that. If I may, I've got very little left. Is a pedestrian ... Can a pedestrian be cited for crossing on a yellow light in Deloge? Yes. Well, there's a jaywalking ordinance. I got to tell ... I'm talking about at the intersection. We're talking about intersections, semaphore-controlled intersections here, right? Maybe stop signs also. Yes. Stop signs also. I don't believe the jaywalking ordinance would cover that. Right. Your expert would say then there's no safety risk for the pedestrian who can see the yellow is about to go red and sprints across the intersection. Well, Your Honor, I think there's a different kind of activity going on there. It's more dangerous. This is very selective, I think. Well, okay. I accept the proposition that any time a pedestrian is in the roadway under any circumstances, it's ... There is some level of risk, but I think the First Amendment requires some careful analysis of the level of risk to get to the real need threshold. That's, to me, the question in this case. I think it's not ... And I understand ... It's not an easy question. We think that Mr. Braymer helped provide scientific technical analysis on that point. Admittedly, we don't have an accident to present to the court as proof. Good. I'd have to agree with that. Thank you. Mr. Rothart, you may proceed, sir. Thank you, Your Honor. Anthony Rothart for the appellees in this case. The district court did not abuse its discretion by granting a preliminary injunction on the limited evidentiary record that was available, and by finding that the plaintiffs are likely to prevail on their claim that the restriction is not narrowly tailored. The grant of a preliminary injunction, especially when here it's based on an evidentiary record, is reviewed for an abuse of discretion. I would like to talk a little bit about McCullen, since it's a recent First Amendment case that has to do with restrictions on expressive activity in streets. I think it's applicable in three ways to this case. First, McCullen reaffirms that for First Amendment purposes, streets remain a vital venue for exchanging ideas and are generally open for expressive activity. One of the notions in the briefs, not so much today, but in the briefs from Deloge, is that streets are different now than they were when there were previous First Amendment cases addressing streets. I think McCullen reaffirms the Supreme Court's view that streets remain presumptively open for express activity, that this isn't turning back the clock on the function of streets. It's a matter of reaffirming the tradition of streets as open for expressive activity. That was more a sidewalks case, though. I suppose the buffers could have included streets. Well, the language is streets and sidewalks, and the buffers did, they were sidewalks, but they also expanded into the streets near the sidewalks. It doesn't do much to... It didn't change the law. It doesn't eliminate the safety differential between streets and sidewalks. I agree. I wasn't suggesting it did. McCullen also, though, I think, increased the government's burden on narrow tailoring. McCullen said that the government must demonstrate that less burdensome measures would fail to achieve the purpose that the government is attempting to achieve with the First Amendment restriction. Here, there have been no prosecutions for obstruction of traffic ever, according in the record. There's been no exploration of limiting the intersections to dangerous intersections. What does the record show? Did the city council do this on whim? Well, no, the city council didn't do this on a whim. The city council enacted this ordinance after its previous ordinance was permanently enjoined by a consent judgment. By what? A consent judgment. Approximately two years ago, the KKK was doing the same activity in the city of Deloge, sued. A preliminary injunction was issued that time by Judge Fleisig based on the same narrow tailoring reasoning, including that they didn't look at just dangerous intersections and just dangerous times. After that preliminary injunction was entered, a consent judgment was entered into the parties to make the preliminary injunction permanent. It was when the Klan returned a few weeks after the consent judgment that they were told by the police that there was a new ordinance that now made their activities illegal again. That's part of the history which makes it appear that these laws are targeting the one group that's been identified as engaging in distribution of literature. Another way in which the government has not shown that it could not achieve its interest by limiting the activity in roadways to solicitation. There have been numerous cases from this court and from the U.S. Supreme Court that draw a distinction between the distribution of literature and solicitation. What's actually shown about when there was some distribution? Was there any interference with traffic? There's testimony from Frankie Ancona who's the imperial wizard of the traditionalist American knights. He testified about not only in Deloge but in other cities where what they've done, which is stand at an intersection when a car comes to the lift up a leaflet. If the driver makes eye contact, they take one step into the street and hand it to them. He testified that there have been no problems at all. No one's been hit. There've been no miscommunications. There've been no problems with the distribution of literature. Most of the cases, the Baton Rouge case was mentioned from the Fifth Circuit. The Acorn case here and Acorn versus the City of Phoenix, all those cases had to do with solicitation. Not in our case, not in the Circuit case, but the other cases, one of the reasons given for why the court ultimately found the provisions nearly tailored is that it was limited to solicitation and did not prohibit distribution of literature. I think that, especially under McClellan, a limitation to solicitation is something that needs to be tried. It's less distributors were handing out was a document soliciting contributions by mail. That would be a solicitation, but it would have no greater safety risk than a newspaper vendor handing a newspaper through the window. It's not the name. It's not the magic in solicitation versus distribution. No, it's the activity. It's the on-site solicitation as a driver has to stay there at the red light and dig out a checkbook or a wallet and go back and forth about what's a good contribution and so forth. The light's going to turn green and we're going to have problems, safety and traffic. I agree. That is exactly what this court was concerned with in Acorn. When the Supreme Court described the activity of solicitation as requiring a back and forth between the parties, whereas distribution is just a showing of a leaflet and taking it or not and moving on, reading it for another day. Under McClellan, our view is that the government must demonstrate that alternatives that are less burdensome on speech would fail to achieve its interests. And there's no evidence in this record here. And it's not enough just to say that there is a government interest. We agree there is a government interest in public safety. McClellan agreed that the regulations at issue furthered a government interest in public safety, but they were nonetheless found unconstitutional. I see. Of course, in McClellan, they said there were all these alternative ways of easily taking care of these things by trespass, prosecutions and the like. And do you suggest that that's the remedy the city here should be left to? Well, I think it would... According to your theory, you couldn't be guilty of trespass because you have an absolute constitutional right to go out in the middle of the street anytime you want. You could be guilty of obstructing traffic if you were in fact obstructing traffic. That would just take it one step down the road, wouldn't it? And... But I think more... Now, in McClellan, they did point to a law like the one in Acorn versus St. Louis County. McClellan did a point to a law like that, that limits solicitation. And that certainly would be a less burdensome way of achieving the interest. What channels do you have remaining to you or your clients? What can they do under the ordinance? Well, ample alternatives was not an issue that was raised. We argued that it's not narrowly tailored. We did not argue that it fails to provide ample alternatives based on this court's precedent. I think... So you say there are adequate alternatives? No, there are not adequate alternatives. The testimony is that this is the most effective way to reach their audience and that they found no other way that's as effective. Well, they're not the judges of that. We are. Well, and that is true. And that is... But that's the only evidence that's in the record at this preliminary injunction phase. Well, what are the facts of life? If this injunction is reinstated or the... No, if the injunction is lifted, what will your people be allowed to do? Well, they would be allowed to stand on sidewalks and hand items to other individuals on sidewalks. Well, if the driver got out of the car and took this step or two over to the sidewalk and took the leaflet, that would not violate the ordinance, but it would create at least a safety risk. Yeah. I think that would not violate the ordinance. It's also not unlawful under the ordinance for someone to enter the road to place a leaflet on a parked car, which does provide an alternative on one hand, but it also, I think, goes to show a lack or under-inclusiveness in the narrow tailoring context. So, McClellan pointed to lots of alternatives, but in footnote eight, the court said, we don't give our approval to any of these alternatives. We're just discussing them to show that there are alternatives. And the alternatives that we suggested here, too, don't mean to approve them, but they do show that there are less burdensome speech restrictions that could be imposed. So, banning nighttime distribution of literature in this manner would be less restrictive and might still meet any government interests that can be proved by the law. Limiting it to intersections where there are sight lines, where drivers can safely stop, and banning it at dangerous intersections where there aren't. To the safety consideration, though, what is your position that that was pretextual at best? Well, in this case, given the history of this case, I don't... My remembering of the record is that there's no evidence of other people handing out literature besides the KKK. But at the same time, Deloge enacted this new ordinance prohibiting all distribution. It created a new ordinance that prohibited some types of solicitation. It's content neutral on its face, yes. And so we have discussed the history in under-inclusiveness, which tends to show that the real purpose is to target the speech of the Klingon, which people disagree with for good reasons. Also, one of the... Has any appellate court, to your knowledge, written on how a government proves empirically or otherwise the level of safety risk needed to I... Not to my knowledge. I don't... And this goes with McClellan being new, and I think putting a little more obligation on the government to show a need that I don't... We're just talking about common knowledge on uncommon subjects. I mean, I'm assuming that you could get a qualified traffic engineer to say most anything's unsafe. Yes. Sometimes. Well, I... So how do we... Anything on the street would be safe. Quantification or quality analysis of this? Yeah. I don't think there's been a circuit court yet, and I don't think the record's full enough for this court to be the first yet. I think a state Supreme Court too. I mean, they do a lot of good work. I'm not aware of any. This case later may provide that opportunity once we've had an opportunity to conduct discovery and have a full evidentiary record. I think that it could become... In Acorn, there was a lot of evidence, and there may be... I suspect there'll be a lot of evidence one way or the other in this case as well, but because this is a preliminary injunction, we're not that developed. What about Judge Gibson's opinion in the St. Louis County case? Pardon? Are you familiar with Judge Gibson's opinion in St. Louis County? Yes. What do you think of that? Well, I think it's fantastic because it's a precedent this court must follow. So I think the burden would be different now after McClellan and other intervening cases, that the government would have more of a burden to show that the restriction is nearly tailored. But as has been alluded to here, there was a mountain of evidence there that the particular activity that had been engaged in was dangerous and was causing actual harm, the harm that the government feared. So I think the analysis might be different, but the result would likely be the same. And if there are no further questions, we'd ask the court to affirm the grant of a preliminary injunction. Thank you. Well, Mr. Young, you used or we used your time. We'll give you a minute for rebuttal. Thank you, Your Honor. First of all, with regard to the McClellan point that's been made, I don't think McClellan in the least intrusive test is the proper test here. McClellan was not a content neutral. It was specifically about the issues surrounding the abortion protesters, advisors, counselors. And then what we have here, and Acorn followed this properly, was Rock Against Racism and Clark versus Community for Creative Nonviolence, specifically held that the Supreme Court, I'm sorry, that the valid regulation of time, place, and manner of protected speech need not be the least restrictive or the least intrusive means of serving the government's content neutral decision. According to those cases, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation. And so consequently, I think that's the proper standard here once the court determines that a real need exists. Your Honor, to answer your question, I don't think there is a case that explains how to present proper evidence. We look pretty hard for it. Thank you. Just in closing, we'd ask that the court enter an order that overrules, denies, causes the preliminary injunction to be lifted, and the case get remanded back to court. Thank you. Very well, the case is submitted and we will take it under consideration.